916 F.2d 820
 1991 A.M.C. 778
 Birendra Mohan SHARMA, Astral Holding Corporation, Freesia
Shipping Corporation, Sun Lily Maritime Inc.,
Doman Tankers Inc., and Zodiac Finance
Corporation, Plaintiffs-Appellants,
v.
SKAARUP SHIP MANAGEMENT CORPORATION, Ole Skaarup, Bent
Larson and Chemical Bank, Defendants-Appellees.
 Nos. 1085, 1086, Dockets 89-9191, 90-7015.
 United States Court of Appeals,
Second Circuit.
 Argued March 26, 1990.
Decided Oct. 17, 1990.
 
 Paul F. Doyle (Sarah L. Reid, Kelley Drye & Warren, New York City, of counsel), for plaintiffs-appellants.
 David H. Braff (William M. Dallas, Jr., Sullivan & Cromwell, New York City, of counsel), for defendants-appellees Skaarup Ship Management Corp. and Ole Skaarup.
 Henry Lewis Goodman (Harold N. Schwinger, Menachem O. Zelmanovitz, Margot B. Schonholtz, Jay Teitelbaum, Zalkin, Rodin & Goodman, New York City, of counsel), for defendant-appellee Chemical Bank.
 Before OAKES, MINER and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal arises out of an action for the alleged breach of a financing agreement concerning three vessels. This agreement was between defendant-appellee Chemical Bank and plaintiffs-appellants Birendra Mohan Sharma ("Mr. Sharma"), Astral Holding Corp. ("Astral"), Freesia Shipping Corp. ("Freesia"), Sun Lily Maritime Inc. ("Sun Lily"), Doman Tankers Inc. ("Doman"), and Zodiac Finance Corp. ("Zodiac"). Appellants claim that Chemical Bank breached the agreement by preventing the refinancing of the vessels, thereby causing their foreclosure. They also claim that defendants-appellees Ole Skaarup and the Skaarup Ship Management Corp. (collectively "Skaarup") tortiously interfered with the contractual relations between appellants and Chemical Bank.
 
 
 2
 Appellants' claims were dismissed by the district court under circumstances described infra. We affirm.
 
 BACKGROUND
 
 3
 Mr. Sharma was the president of Freesia, Sun Lily and Doman. Chemical Bank entered into secured financing agreements with Freesia, Sun Lily, and Doman that enabled the corporations to purchase the tankers WAYUSUT, WINGED DOLPHIN, and VALIANT PORPOISE, respectively, between 1977 and 1981. Mr. Sharma personally guaranteed the obligations of the corporations to Chemical Bank.
 
 
 4
 After 1981 and during a general decline in the shipping industry, the three corporations defaulted on payments of the principal of the loans. By September 1983, they were also in default on interest payments. In late 1983, apparently seeking to increase its oversight of the vessels as the collateral for the debt, Chemical Bank retained Ole Skaarup and the Skaarup Ship Management Corporation to inspect the ships and their records. Although appellants objected to the inspections because Skaarup was a competitor in the shipping industry, they eventually acquiesced.
 
 
 5
 In August 1984, when over $30 million was due on the three mortgages, Chemical Bank advised appellants that it intended to terminate the financing agreements and take possession of the tankers. Chemical Bank arrested the tanker WINGED DOLPHIN on September 7, 1984, and took steps toward foreclosure on the other vessels. Appellants obtained an injunction ex parte from the High Court in London to halt the arrest proceedings. Chemical Bank sought to have the injunction vacated. Four days later, on September 12, 1984 and before an appellate ruling on the validity of the injunction, the parties settled the litigation through a new financing agreement ("Settlement Agreement").
 
 
 6
 The Settlement Agreement provided that appellants' debt to Chemical Bank would be fully discharged by surrender of the vessels or by a lump sum payment of $16.5 million to Chemical Bank with a commitment to refinance. Mr. Sharma was released from his personal guarantee of the debt.
 
 
 7
 The agreement afforded appellants twenty-eight days in which to arrange a refinancing of the vessels and fifty-six days to make the payment of the reduced debt. Under the agreement, appellants had to pay $2000 per day per vessel for the opportunity to refinance. Appellants released Chemical Bank from any claims arising prior to the Settlement Agreement, including the then-pending litigation in England. In addition, Paragraph XIV of the agreement provided that appellants would not "without the prior consent of [Chemical Bank] enter into any time charterparty of a longer duration of three months or any voyage charterparty which in the ordinary course of events would last for more than three months or any demise charterparty." Pursuant to the agreement, appellants delivered bills of sale for the three tankers to an escrow agent, to be delivered to the new owners designated by Chemical Bank should appellants not pay the $16.5 million within the time stipulated.
 
 
 8
 Appellants failed to obtain refinancing within the time designated. They allege that this failure was caused by Chemical Bank's bad faith refusal to approve charter parties of more than three months under Paragraph XIV. On October 31, 1984, appellants and Chemical Bank reached a new agreement ("October Modification") that modified and extended the Settlement Agreement.
 
 The modification provided:
 
 9
 2. On or before, 2nd November 1984, all financial institutions (the "Participants") participating in the refinancing of the Vessels (which shall be in the aggregate amount of US$16 million) shall have approved their respective participations subject only to:
 
 
 10
 (a) satisfactory inspection of the Vessels,
 
 
 11
 (b) the fixing of "Wayusut" and the "Winged Dolphin" under charter parties acceptable to the Participants and,
 
 
 12
 (c) satisfactory documentation of the refinancing.
 
 
 13
 and the Bank shall have received written confirmation of the foregoing from the Institution in form and substance satisfactory to the Bank.
 
 
 14
 3. On or before 7th November 1984, the Bank shall have received from the Institution written confirmation that item 2(a) above is no longer a condition to the closing of the re-financing.
 
 
 15
 4. Upon receipt by the Bank of the confirmation referred to in Item 3 above, the Companies shall be and hereby are authorized by the Bank to enter into charter parties covering the "Wayusut" and the "Winged Dolphin" provided however, that no such charter party shall (a) commit such Vessels, or either of them for a period (including options) of longer than 38 months, or (b) specify an average gross charter rate to the owner thereof of less than US$7.00 per ton, per month and (c) be in any form other than the standard major oil company form.
 
 
 16
 Further extensions were agreed to by Chemical Bank in January and March 1985, but appellants failed to procure refinancing before the final extension period expired on April 1, 1985. They attribute that failure to Chemical Bank's breach of the October Modification by refusing to allow them to enter into two three-year charter parties with Thakur Shipping Company that are alleged to have been within the thirty-eight month limit specified in the Modification. On April 26, 1985, title to the three tankers was transferred to Skaarup as Chemical Bank's designee. Skaarup managed the tankers' operations on behalf of Chemical Bank until Chemical Bank sold the three tankers in 1986 for approximately $14 million.
 
 
 17
 Appellants commenced this action in 1986, claiming that Skaarup tortiously interfered with contractual relations between appellants and Chemical Bank and that Chemical Bank breached implied and express duties of good faith and fair dealing under the various agreements. In the course of pretrial proceedings, they specifically asserted that Chemical Bank did not act in good faith by refusing charter parties in excess of the three months' duration of Paragraph XIV under the Settlement Agreement and breached the October Modification by preventing appellants from obtaining a three-year charter with Thakur Shipping. They also claimed that Chemical Bank acted in bad faith by instructing appellants' insurance broker to cancel the insurance on the three tankers in October 1984, and that Chemical Bank's arrangement with Skaarup, appellants' competitor, was injurious to appellants. Finally, they alleged that Chemical Bank breached an implied duty of confidentiality regarding plaintiffs' banking business and also breached an express duty of confidentiality set forth in the September 12, 1984 Settlement Agreement.
 
 
 18
 Appellants sought as damages, not the market value of the vessels on the date of the various breaches and repossession, approximately $15 million, but the profits that would have been earned in future years had appellants retained the three tankers. In their view, these damages amount to $80 million.
 
 
 19
 The gravamen of appellants' theory is that the Settlement Agreement was entered into by Chemical Bank to escape the effect of the High Court injunction and that Chemical thereafter wanted to prevent a refinancing. They argue that Chemical believed an upturn in the shipping industry was around the proverbial corner and wanted to acquire the vessels to resell them when that corner was turned. According to appellants, Chemical Bank arranged that Skaarup would take title to the vessels and operate them until a profitable sale could be made. Allegedly, this arrangement was necessary to evade banking regulations that prevent banks from owning and operating ships for speculation. It is argued that the bank's various breaches of the Settlement Agreement and October Modification were intended to, and did, prevent a refinancing, enabling Skaarup to take title to the vessels. As a result, appellants lost the substantial profits they would have reaped had they continued to own the vessels when the demand for shipping increased.
 
 
 20
 Chemical Bank, of course, disputes this view of events. It points out that the Settlement Agreement was reached within four days after the ex parte injunction was issued and before its validity had been litigated. That Agreement, moreover, released Mr. Sharma entirely from his personal guarantee and appellants from over $14 million of the amount due, thus making it easier for appellants to satisfy the mortgage. The new principal amount, $16.5 million, is conceded by appellants to have been intended "to approximate the then market value of the vessels." Brief of Appellants at 29. The October Modification and subsequent amendments agreed to by Chemical Bank further liberalized the terms of the Settlement Agreement by extending the time for compliance and reducing the debt to $16 million. When title finally passed to Skaarup, the vessels had a value of $15 million. They were ultimately sold by Chemical Bank for $14 million. In the Bank's view, the present litigation, in which $80 million is sought as damages from a party that lost some $16 million on the transaction, is a case of no good deed going unpunished.
 
 
 21
 In October 1988, the district court dismissed all claims against the Skaarup defendants. See Sharma v. Skaarup Ship Management Corp., 699 F.Supp. 440, 446-47 (S.D.N.Y.1988). With regard to the tortious interference claim,[1] the district court held that appellants had failed to allege that the Skaarup defendants' acts were the "but for" cause of the alleged intentional breach of contract by Chemical Bank. Id. at 447. In the same ruling, the district court also dismissed various of appellants' claims against Chemical Bank, including the claim that Chemical Bank breached the Settlement Agreement by refusing to approve charters of more than three months under Paragraph XIV. Id. at 449. It reaffirmed this ruling on a motion for reconsideration. Sharma v. Chemical Bank, 723 F.Supp. 200 (S.D.N.Y.1989).
 
 
 22
 According to the district court, the following issues remained alive in the case after the October 1988 ruling:
 
 
 23
 Fact questions exist as to whether Chemical breached its duty of good faith and fair dealing through its arrangement with the Skaarup defendants, by advising [plaintiffs' insurance broker] to cancel plaintiffs' insurance in October 1984 and by giving confidential information to unknown persons, and whether Chemical breached its duty of confidentiality to plaintiffs by disclosing information about their Chemical accounts to third parties.
 
 
 24
 699 F.Supp. at 450. Not mentioned, but also pending, was the claim that Chemical Bank prevented appellants from obtaining the two Thakur Shipping charters that are alleged by appellants to have been within the thirty-eight month limit of the October Modification.
 
 
 25
 The parties' trial briefs and the joint pretrial order were filed on October 3, 1989. In a letter dated October 5, 1989, Chemical Bank asked the district court to strike significant portions of appellants' evidence. The district court treated the letter as a motion in limine, and at a pretrial conference on October 11, 1989, Judge Stanton by oral decision struck a number of appellants' proposed findings of fact, including proposed findings on damages.
 
 
 26
 With regard to damages, the court stated that the sole measure of recovery was the market value of the vessels at the time title was transferred to Skaarup and that lost future earnings from the vessels were not recoverable as a matter of law.
 
 
 27
 At a conference the following day, the district court indicated that it had not struck appellants' claim regarding Chemical Bank's alleged breach of its obligation to approve the Thakur Shipping charters under the October Modification. It further indicated that it had not struck appellants' claims of breach of an implied duty of good faith and fair dealing in agreeing with Skaarup that it take title and operate the vessels, its instructions to the insurance broker, and its imparting of confidential information to various persons. The court did, however, reiterate that lost prospective earnings from the vessels was not a proper measure of damages.
 
 
 28
 At the conference, appellants advised the court that because the value of the vessels at the time title was transferred to Chemical Bank's designees was $15.2 million and the final amendment to the Settlement Agreement provided for payment of $16 million to Chemical Bank, the market value of the vessels was less than the amount owed to Chemical under the settlement agreement. Appellants thus concluded that if damages were to be limited to the vessels' market value, they could recover no damages. Accordingly, they requested that the court enter judgment dismissing their claims. On October 18, 1989, the district court entered a final judgment dismissing all plaintiffs' claims pursuant to Fed.R.Civ.P. 54(b).[2]
 
 DISCUSSION
 
 29
 On appeal, appellants challenge the district court's rulings striking proof of consequential damages. Appellants also appeal from the district court's earlier ruling that Chemical Bank had an unqualified right to refuse charters for more than three months under Paragraph XIV of the Settlement Agreement and from the dismissal of the tortious interference claim against Skaarup.
 
 1. Lost Profits
 
 30
 As described above, appellants' theory is that Chemical Bank's alleged breaches of the various financing agreements prevented refinancing and caused appellants to lose the vessels in question. The loss of the vessels in turn deprived appellants of assets that would have produced substantial profits once demand for their use increased sometime in the future. They claim a right to those profits as damages. We disagree.
 
 
 31
 It is a fundamental proposition of contract law, including that of New York,[3] that the loss caused by a breach is determined as of the time of breach. See Simon v. Electrospace Corp., 28 N.Y.2d 136, 145, 269 N.E.2d 21, 26, 320 N.Y.S.2d 225, 232 (1971). It is also fundamental that, where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages.[4] See id at 145-46, 269 N.E.2d at 26, 320 N.Y.S.2d at 233.
 
 
 32
 Numerous cases illustrate these principles. For example, changes in currency exchange rates subsequent to a breach may not be taken into account in measuring damages. See Parker v. Hoppe, 257 N.Y. 333, 178 N.E. 550 (1931). The damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach. See Aroneck v. Atkin, 90 A.D.2d 966, 967, 456 N.Y.S.2d 558, 559 (App.Div. 4th Dep't 1982) (rejecting claim that value of securities should be based on performance of business in 1979 and 1980 rather than at time of breach in 1978 when value was $0). Where a purchaser breaches a contract to buy real estate, the measure of damages is the difference between the contract price and the fair market value at the time of breach, even though the seller is able to sell the real estate only later and for less than the value on the date of breach. See Webster v. DiTrapano, 114 A.D.2d 698, 699, 494 N.Y.S.2d 550, 551 (App.Div. 3d Dep't 1985) (contract price $63,500, value at time of breach $57,500, sold eleven months later for $55,000, damage award should have been $6,000). The same measure applies when a seller of a home breaches and the buyer is forced to assume higher interest rates in purchasing another home as a result of the breach. See Lotito v. Mazzeo, 132 A.D.2d 650, 651, 518 N.Y.S.2d 22, 23 (App.Div. 2d Dep't 1987).
 
 
 33
 Appellants have not led us to any New York authority that even remotely undercuts the numerous contrary precedents. They rely heavily upon Greasy Spoon, Inc. v. Jefferson Towers, Inc., 75 N.Y.2d 792, 551 N.E.2d 585, 552 N.Y.S.2d 92 (1990). However, that case involved a lessor's refusal to execute documents enabling the lessee to obtain municipal licenses and permits to operate a sidewalk cafe adjacent to the lessee's restaurant. The licenses and permits did not have a market value and were not replaceable. Lost profits were therefore the best measure of the loss. Other cases that have awarded lost profits, such as McLeod, Inc. v. R.B. Hamilton Moving and Storage, 89 A.D.2d 863, 453 N.Y.S.2d 251 (2d Dep't 1982), are similarly distinguishable. In McLeod, a lessee of a crane failed to return it in good condition and thus caused it to be unusable for ten weeks. The court awarded the lessor the profits lost for the period in which it could not be leased. Had the crane been permanently rather than temporarily disabled, damages under New York law would have been the value of the crane on the date of breach. Damages for the temporary loss would be the leasing value for that period, which is the same as lost profits.
 
 
 34
 Measuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account. The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce. This stream of income, of course, includes expected future profits and/or capital appreciation. To be sure, uncertainties about the future and lack of perfect information may cause an asset to be under- or over-valued at any particular time. At that time, however, either party has an opportunity to hedge according to his or her judgment about the future stream of income. New York courts have thus explicitly upheld damage awards based on "what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach" and have rejected awards based on what "the actual economic conditions and performance" were in light of hindsight. Aroneck, supra, 90 A.D.2d at 967, 456 N.Y.S.2d at 559. Moreover, appellants are unclear about the time at which damages are to be determined under the rule they espouse. Certainly they are not entitled to select the precise date on which the vessels had their highest value or a period of time that was profitable but that excludes periods when losses occurred. If the time of trial governed, the rule would be a two-edged sword, because courts would have to diminish damage awards where the value of the item decreased or where losses were encountered subsequent to the breach as well as enhance them where conditions improve. However, New York courts have expressly refused to adopt this "wait and see" theory of damages. They have explicitly rejected the use of subsequent changes in value or profits where they would increase an award, see Webster, supra, 114 A.D.2d at 699, 494 N.Y.S.2d at 551 (seller able to sell real estate only later and for price less than value on date of breach), Lotito, supra, 132 A.D.2d at 651, 518 N.Y.S.2d at 23 (buyer forced to assume higher interest rate in purchasing other home subsequent to breach), and where they would decrease the award, see Aroneck, supra, 90 A.D.2d at 967, 456 N.Y.S.2d at 559 (excluding increase in value of shares after buyer breaches contract to purchase).
 
 
 35
 Thus, under New York law, if the contract in question were for the sale of the vessels to appellants and the seller were to breach the contract, appellants' recovery would be limited to the value of the vessels on the date of the breach. We see no reason to reach a different result in the instant matter. In fact, the efficiency of the credit market will be impaired if a measure of damages other than the value of the collateral at the time of breach were applied to secured financing agreements. Collateral satisfactory to the lender almost always has a market value, allowing the lender to take possession and convert the security to money. The principal of the loan is determined by the market value of the collateral and the creditworthiness of the borrower. If, as in the case of the Settlement Agreement, a default permits a foreclosure on the collateral without further liability on the borrower's part, the principal has a ceiling at or near the value of that collateral. The lender would be foolish to risk more because the borrower has little incentive to repay. The interest rate is determined by the time value of money in the credit market and the creditworthiness of the borrower.
 
 
 36
 Under the rule espoused by appellants, lenders would have to take into account the risks of post-foreclosure litigation involving the value of the collateral at some unknown future time. These risks would be particularly great where the collateral fluctuates in value. When that value is low, borrowers would have a great incentive to default, the lender usually encountering a loss. However, if some time after default the value increases, the lender, who may well have lost money on the transaction, may be exposed to future claims that dwarf the original financing. Many ordinary items, such as securities, would be less valuable as collateral. The rule espoused by appellants would thus benefit neither lenders nor borrowers, because it would render secured loans more risky, thereby impairing the availability of credit and increasing interest rates.
 
 
 37
 The facts of the instant case illustrate these principles. In making the Settlement Agreement and October Modification that are the basis for the breach of contract claim, the Bank consented to a reduction of the debt from $30 million to $16.5 million, a further reduction after the breaches alleged as the basis for this litigation to $16 million, a release of Mr. Sharma and an extension of time for obtaining refinancing. Appellants concede that the reductions in the principal of the debt were intended "to approximate the then market value of the vessels." Brief of Appellants at 29. Moreover, it is not disputed that when appellants defaulted, they were released from a $16 million debt in return for vessels worth $15 million. It seems wholly far-fetched to infer that a bank that reduces a mortgage loan by almost 50 percent so as to align the size of the loan with the contemporaneous value of the collateral would have so agreed if it contemplated an exposure to damages five times the size of the reduced loan, $80 million, based on the value of the collateral at some unknown time long after the alleged breach.
 
 
 38
 We find, as did the district court, support in tort law for our conclusion. Had Chemical Bank negligently destroyed the vessels in question, its liability would have been limited to the vessels' market value at the time of their destruction. See The Umbria, 166 U.S. 404, 422, 17 S.Ct. 610, 617, 41 L.Ed. 1053 (1897); Ozanic v. United States, 165 F.2d 738, 743 (2d Cir.1948); The Hamilton, 95 F. 844, 845 (E.D.N.Y.1899). It would be odd to deny damages for lost profits in tort and award them in the present case, particularly since the measure of damages in tort cases is more generous than in contract actions. See Corbin, On Contracts, Sec. 1019.
 
 
 39
 2. Refusal of Charters Under Paragraph XIV of the Settlement Agreement
 
 
 40
 Appellants argue that the district court erred in holding that under Paragraph XIV of the September 12, 1984 Settlement Agreement, Chemical Bank had an absolute right to withhold approval of charters longer than ninety days.[5] The district court was clearly correct, however, in finding that Paragraph XIV is unambiguous, 723 F.Supp. at 201, and gives Chemical Bank an unrestricted right to refuse charters longer than three months. This right furthers the purpose of the agreement to provide a limited opportunity to secure refinancing and to protect Chemical Bank's interest in the collateral for the long-overdue debt. Appellants would have us imply a duty to act reasonably in such circumstances, but the content of any such duty is entirely unclear in light of the provision's plain intent to render the Bank's refusal unreviewable. We see no reason not to acknowledge the plain meaning of a clause that allows a lender to impose restrictions on the use of collateral and to have the unreviewable right to invoke those restrictions. Secured lenders have a clear interest in overseeing the disposition of their collateral and understandably bargain for rights that may be exercised without a court or other tribunal deciding whether such exercise was reasonable according to standards the parties have not defined.
 
 
 41
 Appellants' argument that Chemical Bank knew that long-term charters were necessary to obtain refinancing and was therefore bound to approve such charters where "reasonable" is unavailing. If the parties were indeed aware of that fact, Paragraph XIV could not have been inadvertent. It reflects, therefore, a conscious decision to allow Chemical Bank to refuse all such charters lest the refinancing fall through while the vessels become bound by long-term charters. Appellants were, of course, free to arrange refinancing, if available, simultaneously with long-term charters.
 
 
 42
 Extrinsic (parol) evidence regarding the terms of the agreement was properly excluded in light of the absence of any ambiguity. See Cibro Petroleum Products, Inc. v. Sohio Alaska Petroleum Co., 602 F.Supp. 1520, 1545 (N.D.N.Y.1985) (stating general contracts principle that if contract is unambiguous, extrinsic evidence should be excluded), aff'd per curiam, 798 F.2d 1421 (Temp.Emer.Ct.App.), cert. dismissed, 479 U.S. 979, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986); Schmidt v. Magnetic Head Corp., 97 A.D.2d 151, 157, 468 N.Y.S.2d 649, 654 (2d Dep't.1983) (reference to extrinsic evidence not permitted even to determine whether ambiguity exists in contract).
 
 
 43
 Finally, we reject as utterly frivolous the argument that the Settlement Agreement is rendered "illusory" by this straightforward interpretation of Paragraph XIV. The agreement reduced appellants' liabilities by almost 50 percent, released Mr. Sharma from his personal guarantee, and extended the time in which appellants might satisfy the debt. As noted, moreover, nothing in the Agreement prevented appellants from arranging refinancing simultaneously with a long-term charter.
 
 3. Tortious Interference Claim
 
 44
 As to the tortious interference claim against Skaarup, the district court properly dismissed Count III of the amended complaint for failure to allege that Skaarup's actions were the "but for" cause of Chemical Bank's alleged breach of the Settlement Agreement. Intentional procurement of a breach is an essential element of the tort of interference with contractual relations. A plaintiff must allege that "there would not have been a breach but for the activities of defendants." Special Event Entertainment v. Rockefeller Center, Inc., 458 F.Supp. 72, 78 (S.D.N.Y.1978); see Merrill Lynch Futures, Inc. v. Miller, 686 F.Supp. 1033, 1040 (S.D.N.Y.1988). The appellants' theory of this case--that Chemical Bank's efforts to obtain the vessels were motivated by profit--is incompatible with an allegation of "but for" cause as to Skaarup. As stated by the district court, "In no way do plaintiffs allege that the Skaarup defendants were the motivating force behind Chemical's breach." 699 F.Supp. at 447.
 
 CONCLUSION
 
 45
 Because of our disposition of the legal issues raised on this appeal, the various procedural errors claimed by appellants are moot. Affirmed.
 
 
 
 [1]
 As to the Skaarup defendants, appellants challenge on appeal only the dismissal of Count III, the tortious interference claim
 
 
 [2]
 The district court's order severed and stayed proceedings on Chemical Bank's counterclaim pending the appeal in this matter
 
 
 [3]
 The Settlement Agreement provides that it "shall be governed by and construed in accordance with English Law and shall be subject to the Jurisdiction of the English Courts." The parties agree, however, that New York and British law are the same and ask us to apply New York law. Brief of Appellants at 25; Brief of Appellee at 18. See also 723 F.Supp. at 202 (noting that English law comports with New York law on contract interpretation question)
 
 
 [4]
 Whether we view appellants' claim as involving the deprivation of financing or the deprivation of the three vessels is irrelevant because each had a market value at the time of the breach
 
 
 [5]
 Whether this issue need be reached in view of our disposition of the consequential damages issue is unclear. We reach it to obviate the need for further proceedings