**GTS INDUSTRIES S.A., Plaintiff,**

v.

**S/S "HAVTJELD", her engines, tackle, boilers, etc., in rem, K/S Havtjeld, A/S Havtor Management, and A/S Bulkhandling in personam, Defendants.**

No. 92 Civ. 2297 (RLC).

United States District Court,
S.D. New York.

July 29, 1994.

Law Offices of David L. Mazaroli, New York City, for plaintiff; David L. Mazaroli, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendants; Chester D. Hooper, Sharon Elliot, of counsel.

ROBERT L. CARTER, District Judge.

I

Plaintiff, GTS Industries S.A. ("GTS"), a corporation organized under the laws of France, is engaged in the manufacture and sale of steel products including steel coated pipes. Defendants, the owners and operators of M/V Havtjeld, an ocean vessel, are engaged in the carriage of cargo by water for hire.

Plaintiff and defendants entered into a charter party dated March 14, 1991, pursuant to which defendants agreed to transport from Dunkirk, France to Philadelphia, Pa., USA a shipment of 6,431 metric tons of coated pipe, delivered duty paid to staging yard Philadelphia, for sale to Transcontinental Gas Pipe Line Corporation of Houston, Texas ("Transco"), at the price of $6,679,617.26. The pipe was to be used by Transco in an underground natural gas pipeline.

Pursuant to the charter party, defendants were paid some $452,270 in charges and fees. Clause 2 of the agreement provided for owner responsibility

> for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by improper or negligent stowage of the goods ... or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied....

(Pl.Ex. 23.)

Clause 5(b), labeled "F.I.O. and free stowed/trimmed" and provided that the

> cargo shall be brought into the holds, loaded, stowed and/or trimmed ... by the Charterers or their Agents, free of any risk, liability and expense whatsoever to the Owners.

(*Id.*)

The shipment consisted of 1,660 pieces of pipe with a three layered external coating of polyethylene and ten externally uncoated pieces of pipe. The external coating was protection against corrosion which could cause rupture or breakdown. The pieces of pipe had beveled ends to facilitate the welding of one pipe to another in the pipeline.

Prior to transport to Dunkirk for shipment, the pieces of pipe, coating and end bevels were subjected to quality control tests and inspections and were determined to be in good order and condition and in compliance with manufacturing and contractual specifications. (Pl.Ex. 4–6)

The cargo was loaded onto the M/V "Havtjeld" beginning on or about April 2, 1991. Surveyors acting for plaintiff and defendants inspected the cargo on the Dunkirk pier and during loading. Captain Ingar Aakerman, defendants' employee at the time and in charge of all of defendants' pipe shipments from Dunkirk, inspected the cargo with the master and chief officer of the vessel before, during and after the loading aboard the M/V "Havtjeld". Captain Aakerman assisted the ship's officers in the supervision of the loading, stowage and lashing of the cargo aboard

the vessel. (Aakerman Dep. at 48–52). Aakerman, who had a copy of the charter party with him during the loading of the cargo, testified that all operations related to the loading of the cargo were under the master's responsibility (id. at 50); that the pipes had no wrapping or covering so that their nature and characteristics were visible and apparent (id. at 53–54); that there were no objections to the way the pipes were loaded or stowed (id. at 18); that he inspected the cargo after loading to be sure the pipes were properly loaded and properly stowed (id. at 19); that he saw some minor scratches in the coating and a beveled end flattened about two centimeters, but that the cargo was in good condition. (Id. at 19–20.)

On April 3, 1991, defendants issued a bill of lading for the shipment. The bill of lading stated that the cargo was in apparent good order and condition except for 17 pieces of pipe noted as damaged on the master's protest attached to the bill of lading. The damage listed as to the coating:

> 2 pipes, the damage listed as 3mm in depth; 10 pipes, 2mm in depth; 1 pipe 1mm in depth. 2 pipes, damage noted to metal exposed 50 × 50mm; one pipe had an end flattened 2cm; and one pipe, there was the notation "BVI" [which I take to mean beveled end] pricked 3mm depth.

(Pl.Ex. 1 at 3.)

Also attached to the bill of lading was a preshipment condition survey prepared by Captain Michel de Chalvron covering the interests of the defendants. He reported that the shipment consisted of 1,670 steel pipes, 1,660 pipes with 4mm thick polyethylene external coating and "ten unprotected and rusty" pipes. He reported that the bevels at the ends of each pipe had no special protection, but the outside surfaces "and bevels at the ends were duly protected at contact points with steel wires in order to prevent chafing and bevels crushing". (Pl.Ex. 1 at 5.) The pipes were reported to be in general good condition, with no damage to bevels at the ends. There was some damage to the polyethylene coating and when damage to the coating was equal to or more than 3mm deep, repairs were done immediately. Thirteen pipes were listed as thus repaired; otherwise 20 pipes were repaired with a wraparound adhesive polyethylene tape; one of these was "found with the tape slightly unadhesive", and 2 pipes were partially repainted in the inner side at the request of a U.S. inspector. (Id. at 6.)

There was no countervailing evidence as to the condition of the pipes after being loaded and stowed on board the vessel at Dunkirk, for departure on April 3, 1991, en route to Philadelphia. The vessel docked at Philadelphia on or about April 16, 1991, and discharge of the cargo commenced.

Surveyors on behalf of plaintiff, defendants and stevedores were in attendance when the ship's holds were opened and during discharge. All the surveyors noted that the cargo was damaged in stow aboard the vessel, with cuts, scratches, with pieces of rust scale imbedded in the pipe coating. Glass, nails and other debris were also noted as a source of damage. Rocky Carney of the I.S. Derrick Co., the surveyor operating in the interest of the cargo underwriters, reported that the largest percentage of damage to the cargo was damage to the coating due to pieces of rust scale from the vessel. The rust scale, according to Carney's report, caused cuts and gouges to the coating during the voyage as the pipes shifted with the pitching and rolling of the vessel. Additional damage from the rust scale occurred during discharge as it shifted onto successive tiers of the stow causing cuts, scratches and gouges. Also improper handling by the stevedores in discharging the pipes in wooden saddles, called "Napoleon Hats," with protruding nails resulted in extensive damage in terms of cuts, scrapes and gouges to the coating. In addition there was damage to the beveled ends of the pipes during the voyage and on discharge.

Scott Esslinger, surveyor for defendants at the discharge in Philadelphia, noted the presence of "rust scale with some ... pieces up to approximately 1 inch in diameter ... in all compartments being discharged on April 18 [, 1991]...." (Esslinger Dep. at 17.) The scales appeared to have fallen or been scraped from the overhead or the coaming of the vessel, or to have been scraped from the

lifting gear used to remove the pipes. (*Id.* at 20.)

Carney's handwritten 3 page field notes constitute his on site observations of the discharging operations on April 17, 18 and 19. The entry for April 17 states:

Coating damage was much worse than expected 75% to 100% of pipe at times were being marked with coating damage.... [I]t was observed that nails driven in the top of the saddles [so called Napoleon Hats] were catching on the coating causing transverse deep marks (gouges) in the coating. All parties concerned were made aware of this pointing this out within each hold working (sic). All surveyors were in agreement. Measures were taken by the Port Capt since wooden saddles were supplied by ship. However, even after the use of carpet, pipe coating in instances was damaged due to improper placement of carpet and/or carpet would side (sic) off wood when first pipe made contact carpet (sic).

(Def.Ex. UU at 1.) The entry for April 18 reports:

Coating damage was very high, bevel damage was low.... Coating damages were of several types—transverse gouges near the ends and scratches along the length, usually where pipes had been touching.

(*Id.* at 2.) The entry continues:

This surveyor examined each hold and found the following in each hold 2–5. Previous coating gouges in some pipes; nails found between pipes; rust scale in various areas, heavier under coaming; wooden saddles with nail heads catching on coating; timbers used in wing area with cut end against pipe; stevedore damage hitting coaming/sides/bulkhead. Surveyors from GTS, P & I, Stevedores, Port Capt. as well as Transco was shown in each hold these conditions. All surveyors were in agreement.

(*Id.* at 2–3.) On April 19, 1991, the only pertinent entry is "coating and bevel damage about same." (*Id.* at 3.)

Carney testified at trial and attributed the majority of the damage to the coating to rust scale which had fallen from the overhead structures of the cargo compartments 2, 3, 4 and 5. He indicated that the rust scale in the cargo compartments of the vessel were of long standing duration.

At a meeting a day before the discharge began, representatives from Transco explained to the surveyors and other representatives of the various parties in interest that all pipes would be carefully inspected and damage to the coating and bevel ends of the pipe had to be repaired and reconditioned before being accepted. The repairs were performed at a staging area a short distance from where the cargo was being discharged from the vessel. The pipes were loaded onto trucks from the vessel, taken to the staging area, inspected and repaired. Howard Love Machinery Supply Inc. was hired to repair the coating damage and Covenant Pipe Service Inc. was hired to repair the bevel ends. No objection to this procedure or to the organizations hired to do the repairs was voiced by any of the surveyors or other representatives, including those for defendants. There was some discontent voiced by Esslinger that Transco was not accepting even minor damage to the coating, but no alternative solution was suggested.

The total repair cost incurred was $201,-196.36. Carney testified that of that amount $166,572 was for labor and equipment to repair the coating damage, plus $5,728.36 for materials, for a total of $172,300.36. (Trial Tr. at 17.) Carney allocated $130,000.00 of this amount to repair damage to the coating caused by rust scale in the cargo compartments of the vessel. (*Id.* at 17–23.) He allocated $26,000.00 of the coating repair cost to damage resulting from discharging the pipes on wooden saddles "Napoleon Hats" with protruding nails. (*Id.* at 25–27.) The remaining coating damage repair cost were attributed to nails and glass embedded in the cargo.

One hundred thirty-nine bevel ends had to be repaired at a total cost of $28,896.00. (*Id.* at 28–29.) Damage to the bevels ends occurred during mishandling by the discharging stevedores. Of the $28,896.00 expended in repair costs for this item, Carney attributed $14,000.00 to mishandling which he personally witnessed by the stevedores during

the 4 days the cargo was being discharged. (*Id.* at 29–30.) He saw bevel ends being banged against the bulkhead, catching on the coaming and hit up against the wing into the coaming.

Cargo underwriters paid GTS's insurance claim of $201,196.36 in repair cost, plus $11,630.76 in survey fees for a total of $212,827.12, which plaintiff seeks to recover from defendants.

## II

■ The parties have stipulated that plaintiff is the real party in interest entitled to bring this action on its own behalf and on behalf of its subrogated cargo insurers. The governing contract of carriage in this case is the charter party, and, therefore, the burden of proving damage as well as the cause of the damage remains always with the plaintiff. *Associated Metals & Minerals Corp. v. S/S Jasmine,* 983 F.2d 410, 414 (2d Cir.1993) (citing *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 110–11, 62 S.Ct. 156, 160–61, 86 L.Ed. 89 (1941)). A charter party is merely a contract, subject to all the rules and requirements of contract law. Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, § 4–1 at 195 (2d ed. 1975). The charterer must establish that the damage for which he seeks recovery was proximately caused by the carrier's breach of a one or more of the terms of the charter party. *Associated Metals & Minerals Corp.,* 983 F.2d at 414 (citing *Commercial Molasses Corp.,* 314 U.S. at 110, 62 S.Ct. at 160).

The cargo was loaded at Dunkirk on April 2 and 3, 1991. The shipment of steel pipes, as described by the surveyor, Michel de Chalvron in a preshipment conditions survey, was in good condition and the bevel ends of the pipes were not damaged. There was some damage to the external polyethylene coating of the pipes. Thirteen (13) pipes with the damage to the coating 3mm deep or more were repaired on the spot, and some 20 pipes were repaired with an adhesive wraparound polyethylene tape. There were also ten bare, rusty pipes in the shipment. Some 17 damaged pipes were not repaired and shipped to Philadelphia, subject to a protest by the ship's master, noted on the bill of lading.

■ The bill of lading notes only the ten bare pipes and the 17 damaged pipes. Defendants argue that since immediate repairs were performed on coating with damage of 3mm or more in depth the cargo departed with coating damage of less than 3mm in depth. There is no evidentiary support for this contention. The bill of lading and the Chalvron survey indicate that except for the 17 damaged and ten bare pipes, the cargo when it left Dunkirk aboard the M/V Havtjeld bound for Philadelphia, was in good condition. There is no evidence of any damage occurring during the loading or stowage of the pipes. Indeed, Captain Aakerman, on hand throughout the loading and stowage process, operated on the assumption that it was the ship's officers and his responsibility to supervise the loading and stowage process. He observed nothing untoward during the loading or stowage of the cargo, and on inspecting the cargo before the ship's departure from Dunkirk found it to be in good condition.

Plaintiff has made a prima facie showing that except for the indicated exceptions, the cargo left Dunkirk in good condition.

The charter party, clause 2, places responsibility on the defendants for any loss or damage to the cargo "caused by any improper or negligent stowage of the goods ... or by personal want of due diligence [by defendants] to make the vessel in all respects seaworthy...." (Pl.Ex. 23.)

■ Clause 5(b) is a FILO provision placing on the plaintiff charterer the task of bringing "the cargo into the holds, loaded and stowed ... free of any risk, liability and expense whatsoever to the owners". (*Id.*) A FILO provision makes the shipper responsible for loading the cargo and paying the stevedores and other personnel needed for this task and the carrier responsible for discharging the cargo and for paying for those services. *Sumitomo Corp. of America v. M/V "Sie Kim",* 632 F.Supp. 824, 834 (S.D.N.Y.1985) (citations omitted) (Gagliardi, J.).

Clause 5(b) is headed "F.I.O. and free stowed/trimmed" which ordinarily shifts the risks and expense of loading, stowing and discharging cargo on the shipper. *Associated Metals & Minerals Corp. v. M/V Arktis Sky*, 978 F.2d 47, 49–50 (2d Cir.1992). However, in the body of the clause the reference to the shipper's responsibility for discharging cargo is crossed out, leaving on the shipper only the burden of loading and stowage of the cargo without risk to defendants. This makes this a FILO provision.

Clause 2 of the charter party, which places responsibility for proper stowage on the carrier, and clause 5(b), which could be interpreted as placing that obligation on the shipper, appear to be in conflict. Evidently, Captain Aakerman and the ship's officers operated in the belief that Clause 2 was controlling since the ship's officers and he, as representative of the defendants, supervised the loading and stowing of the cargo.

█ If this case were governed by the Carriage of Goods by Sea Act ("COSGA"), 46 U.S.C.App. §§ 1300–1315 (1988), as defendants originally contended, the carrier would remain liable for improper stowage, since COGSA does not permit the carrier to divest itself of the duty to insure the proper stowage of the cargo. *Associated Metals & Minerals Corp. v. M/V Arktis Sky*, 978 F.2d 47, 50 (2d Cir.1992); *Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 330 (2d Cir.1972). However, if the parties agree to hold the vessel owner free of liability for improper stowage, their private agreement controls, not COGSA. *Associated Metals & Minerals Corp. v. S/S Jasmine*, 983 F.2d at 412–13.

Defendants urge the admission of parol evidence to establish that the stowing of the cargo was the plaintiff's responsibility as agreed to by the parties. The matter appears to be moot, however, since there was no evidence of damage resulting from improper stowage of the cargo.

Defendants also seek parol evidence to show that the parties meant the FIO labelling of clause 5(b) to be controlling. Since the verbiage in the body of the clause is clear and unambiguous, parol evidence is not warranted. "Extrinsic (parol) evidence regarding the terms of [an] agreement [is] properly excluded in ... the absence of any ambiguity." *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir.1990), *cert. denied*, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991) (citations omitted). The language which would have kept the clause a FIO provision is excised, which clearly evidences the intent of the parties that the ship owners, not the shipper, was to be bear the expense and risk of discharging the cargo on its arrival at Philadelphia. Indeed, the evidence establishes that the defendants assumed responsibility for the discharge operations at Philadelphia.

The cargo arrived in Philadelphia and when the holds of the vessel were opened in the presence of the representatives of all the parties considerable damage to the coating of the pipes was discovered due to rust scale from the coaming of the cargo compartments, and from nails and glass debris, apparently left by the loading stevedores at Dunkirk, which had become imbedded in the pipes' coating. During the discharge of the cargo, the discharging stevedores inflicted considerable damage to the pipes' coating by discharging the pipes on wooden saddles with protruding nails and damaged the bevel ends of the pipes by banging them against parts of the vessel in the off loading process.

█ Clause 2 of the charter party is an express warranty on defendants' part "to make the vessel in all respects seaworthy. One essential aspect of seaworthiness is that the vessel must be fit for the purpose intended under the charter party," *Nichimen Co.*, 462 F.2d at 332; when a vessel owner has breached its warranty of seaworthiness, the "cargo owner may hold the shipowner on his warranty to the charterer." *Siderius, Inc. v. M.V. "Amilla"*, 880 F.2d 662, 665 (2d Cir. 1989) (quoting *New York Cent. R.R. v. New York, N.H. & H.R.R.*, 275 F.2d 865, 866 (2d Cir.1960)).

█ The uncontroverted testimony was that much of the damage to the pipes' coating was caused by rust scale in the cargo compartments and Carney testified that this condition was of long duration. Defendants seek to escape liability for this breach of the warranty of seaworthiness by contending

that clause 4, part 111 of the charter party providing that the ship's "holds are to be properly swept, cleaned and dried ... to the Charterers' satisfaction", placed on the plaintiff responsibility to inspect and approve the ship's holds before the cargo was loaded. Accordingly, defendants argue that by accepting the ship as satisfactory, plaintiff cannot now complain about the presence of rust scale since this was a preexisting condition. However, the duty to provide a seaworthy ship is a duty the shipowner cannot delegate, and if cargo damage is caused by "some defect in the vessel which the Captain had failed to discover and correct, primary liability" falls on the ship owner. *Nichimen,* 462 F.2d at 332.

■ Damage to the cargo from the rust scale is defendants' responsibility, as is damage to the pipes' coating from protruding nails on the wooden saddles and to the bevel ends of the pipes in being banged against the bulkhead and other parts of the vessel during the offloading operation. Damage to the pipes' coating from embedded nails and glass debris appears to have been an aftermath of the loading for which defendants are not liable.

■ Plaintiff incurred $201,196.36 in repair costs, plus $11,630.76 in survey fees. Plaintiff is entitled to be reimbursed for the reasonable and necessary costs for repairing the damaged cargo, *Scott & Williams, Inc. v. Pittston Stevedoring Corp.,* 422 F.Supp. 40, 43 (S.D.N.Y.1976) (Weinfeld, J.); *Interstate Steel Corp. v. S.S. Crystal Gem,* 317 F.Supp. 112, 121 (S.D.N.Y.1970) (Tenney, J.), and necessary expenses incidental to the loss, such as survey fees. *Santiago v. Sea—Land Service, Inc.,* 366 F.Supp. 1309, 1317 (D.P.R. 1973).

■ Carney testified that the repair costs were reasonable. Esslinger, who acted for defendants, stated in deposition testimony that Transco was sending for repair some pipes with minor coating damage, but it is not clear that he made any complaint at the time. At any rate, the vulnerability of the pipes to corrosion and their intended use in an underground gas pipeline makes putative corrosion a public hazard which cannot be risked. Accordingly, the court cannot second guess Transco as to the need for repair.

Defendants challenge Carney's allocation of the cause of damage to the pipes because he made no such allocation in his field report. Carney did not quantify the kinds of repair costs until after litigation was instituted. But there was no need to do that until he was required to do so in pressing plaintiff's claims in this litigation. The defendants have proposed no alternative allocation of repair costs. The damage estimate of a surveyor is a valid basis for determining recoverable damages. *Nissho–Iwai Co. v. M/T Stolt Lion,* 1986 A.M.C. 269, 271, 1984 WL 365 (S.D.N.Y.1984) (Goettel, J.) (citing *Empresa Central Mercantil De Representacoes, Ltda. v. Republic of the United States of Brazil,* 147 F.Supp. 778, 780 (S.D.N.Y. 1957), *aff'd,* 257 F.2d 747 (2d Cir.1958)).

Accepting plaintiff's allocation of the repair costs, plaintiff is entitled to recover from defendants $130,000.00 for repair of coating damage due to rust scale, $26,000.00 for repair of damage from the protruding nails on the wooden saddles and $28,896.00 for damage to end bevels caused by rough handling of the discharging stevedores for a total of $184,896.00 for repairs.

From this amount $8,000.00 is deducted for repair of the 17 damaged pipes during the loading process. Carney estimated that reasonable cost of repair of these 17 pipes was $5,000.00. In addition there were ten pipes with no external protective coating, described by the surveyor at Dunkirk as "unprotected and rusty". No mention was made of these pipes during the hearing or post trial procedures. They could have been included in the repair operation in Philadelphia. Accordingly, the court is allocating $3,000.00 for those pipes. $8,000.00 is to be deducted for these items, leaving $176,896.00 in repair costs to be recovered from defendants. Plaintiff is also entitled to recover $11,630.76 in survey fees, for a total recovery against defendants of $188,526.76.

■ Although awarding of prejudgment interest is within the court's discretion, it is generally awarded, unless special circumstances warrant a contrary result. *See In-*

*terstate Steel Corp.*, 317 F.Supp. at 123–24. No countervailing circumstances are present here. Accordingly, plaintiff is awarded pre-judgment interest at 9 percent.

**IT IS SO ORDERED.**