**CHRISTIAN DIOR–NEW YORK, INC.,**
**Plaintiff-Appellee,**

v.

**KORET, INC., Defendant-Appellant.**

**No. 787, Docket 85–7918.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 29, 1986.

Decided June 2, 1986.

William J. McSherry, Jr., New York City (Amy D. Kanengiser, Spengler Carlson Gubar Brodsky & Frischling, New York City, of counsel), for defendant-appellant.

Todd B. Sollis, New York City (Raymond T. Munsell, Windels, Marx, Davies & Ives, New York City, of counsel), for plaintiff-appellee.

Before: FRIENDLY,* OAKES and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Koret, Inc. appeals from a grant of summary judgment and permanent injunction by Judge Duffy, 620 F.Supp. 54, to Christian Dior-New York, Inc. ("Dior"). Because the district court resolved triable issues of material fact in granting the motion for summary judgment, we reverse.

## BACKGROUND

This case involves a dispute between two corporations following termination of their thirteen-year licensing relationship. Dior, a New York corporation and a subsidiary of Christian Dior, S.A., a French fashion company, grants exclusive licenses to various manufacturers to produce goods bearing the "Christian Dior," "Dior" or "CD" marks. Koret, Inc., also a New York corporation, manufactures and distributes ladies' handbags and related products, and was a Dior licensee from 1972 to 1984.

Briefly summarized, the conflict arose when negotiations between Dior and Koret failed to result in an extension of their last licensing agreement, which expired on December 31, 1984. Paragraph 16 of the agreement, which we set out in the margin,[1] provided certain post-termination pro-

---

* Judge Friendly participated in oral argument in this case and voted before his death on March 11, 1986 in favor of the result reached in this opinion.

1. Paragraph 16 of the agreement provides in part:

(c)(i) Upon expiration or termination of this agreement Licensee shall cease the manufacture of Dior articles but, except in the event of termination for breach, may continue to sell or offer for sale, only through prestigious channels ... for a period of three (3) months, all the Dior Articles set forth on the

cedures. These provisions allowed Koret three months after termination in which to sell off Dior inventory through "prestigious channels," and limited the amount of inventory Koret could have on hand in its final quarter as licensee. The purpose of Paragraph 16 was to ensure an orderly termination of the licensing relationship. However, in the period prior to the expiration of the agreement, Koret alleges, the parties were negotiating to extend the agreement and did not know whether the relationship would in fact terminate. Koret further alleges that in that period it continued to contribute to a Dior advertising campaign, the benefits of which would not be realized until after expiration of the license agreement. It also claims that it continued to accumulate inventory at a level greater than would have been the case had it expected to be bound by Paragraph 16. Koret contends that it made these expenditures in reliance upon oral assurances from Dior representatives that, in the event that the ongoing negotiations failed, Dior would either extend the current agreement or waive the sell-off restrictions to enable Koret to dispose of its Dior inventory and thereby recoup its investment.

The record indicates that Dior gave written notice to Koret on April 11, 1983 that it intended to terminate the licensing relationship upon expiration of the agreement on December 31, 1984. Koret responded with a letter explaining its view that Dior had misevaluated Koret's past performance and offering to spend additional monies to improve its performance as a licensee. Dior president Colombe Nicholas responded by letter dated June 10, 1983 that, while she disagreed with Koret's evaluation of Koret's past performance, she was willing to accept some of Koret's proposals for improvement. The letter noted that since the agreement did not expire for some eighteen months, Dior could evaluate Koret's performance in the ensuing months and reconsider the decision to terminate the relationship. While the letter of June 10 did not withdraw the letter of April 11, it did state that "Dior remains willing to reconsider its position based upon your implementation of [the aforementioned] proposals." However, by letter dated March 21, 1984, Nicholas again informed Koret's President and sole shareholder Michael Gordon that Dior intended to terminate the relationship on December 31, 1984.

Koret claims that if the letter of March 21, 1984 had been the final communication with Dior, Koret would have wound down its Dior operation and disposed of its inventory within the parameters spelled out in the agreement. Koret alleges, however, that Dior verbally retracted the position taken in the March 21 letter and continued to negotiate with Koret concerning a license renewal. It further claims that Dior representatives expressly agreed not to enforce Paragraph 16 in the event the negotiations failed. That negotiations over a license renewal actually took place is evidenced by letters exchanged by the parties and their counsel, although these documents are silent with regard to Paragraph 16.

On January 3, 1985, three days after the expiration of the agreement, Nicholas informed Koret by letter that because the negotiations failed, Dior's auditors would be checking Koret's inventory to ensure Koret's compliance with Paragraph 16. She instructed Koret to remove the Dior sign from its headquarters and to cease

---

inventories referred to in subdivisions (1) and (2) of subparagraph (b) above [Finished goods, merchandise in process of manufacture and uncut piece goods].

(c)(iii) During the three-month period immediately preceding the expiration of the term of this agreement (hereinafter "Final Quarter") Licensee shall not have in hand (a) an inventory of Dior Articles in excess of the inventory of such Articles which it possessed during the three-month period immediately preceding said Final Quarter; or (b) an inventory of uncut piece goods or unfinished Dior Articles greater than Licensee shall be able to manufacture into finished Dior articles and sell in accordance with the terms of this agreement during said Final Quarter. The intent of this provision is to prevent the Licensee's having a large inventory of Dior Articles at the expiration of this agreement, thereby facilitating the orderly disposition of Licensee's inventory thereof.

holding itself out as a Dior licensee except for purposes of disposing of inventory pursuant to Paragraph 16. Upon learning that Koret was continuing to hold itself out as a Dior licensee after the expiration of the three-month sell-off period on March 31, 1985, Dior initiated this action on April 4. Dior sought a temporary restraining order under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and New York State law, to prevent Koret from infringing Dior's registered trademarks by selling the $600,000 worth of Dior inventory it had on hand.

Judge Edelstein granted the temporary injunctive relief requested by Dior and scheduled a hearing before Judge Duffy on Dior's application for a preliminary injunction. At this hearing, held on April 23, 1985, Dior produced two witnesses, while Koret relied on its cross-examination of the Dior witnesses and an affidavit of Thomas Tillander, Vice-President of Koret. Judge Duffy granted the preliminary injunction the same day.

On May 5, Koret filed its answer in which it raised affirmative defenses. Dior then moved for summary judgment and a permanent injunction. Koret cross-moved for relief from the preliminary injunction on the strength of affidavits of Tillander, Gordon, and Koret's attorney in this action, William J. McSherry, Jr. Judge Duffy granted the injunction and Dior's motion for summary judgment on October 8, 1985.

On appeal, Koret contends that its affidavits and documentary evidence raised triable issues of material fact with respect to its defenses of estoppel, waiver, and contract modification, which the district court improperly resolved. We agree and reverse.

## DISCUSSION

It is of course improper to resolve a genuine issue of material fact on a motion for summary judgment. *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir.1984). An examination of Koret's defenses reveals that it has raised such issues of fact.

### 1. *Estoppel*

■ Koret claims that, in view of the pendency of negotiations over a license renewal, Nicholas repeatedly asked Koret representatives to continue business as usual and assured them that, if negotiations failed, either an extension of the license would be granted or Paragraph 16's limitations on post-termination sales of inventory would be waived. Koret thus contends that Dior is estopped from enforcing the restrictions of Paragraph 16.

To establish estoppel under New York law, Koret must show that Dior represented that it would renew Koret's license or grant an extended sell-off period, expecting Koret to rely upon its representations and that Koret justifiably relied upon Dior's representations to its detriment in making expenditures for advertising and inventory. *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184, 436 N.E.2d 1265, 1269–70, 451 N.Y.S.2d 663, 667–68 (1982); *Triple Cities Construction Co. v. Maryland Casualty Co.*, 4 N.Y.2d 443, 448, 151 N.E.2d 856, 858, 176 N.Y.S.2d 292, 295 (1958).

Dior asserts that Koret's affidavits are naked assertions, unsupported by documentary evidence or squarely contradicted thereby, and thus insufficient under Rule 56(e), Fed.R.Civ.P., to preclude summary judgment. Rule 56(e) states that once a movant has met its burden of showing the absence of triable issues of material fact, the resisting party "may not rest upon the mere allegations or denials of his pleading" but "must set forth specific facts showing that there is a genuine issue for trial." In our view, the record contains sufficient evidence of the alleged oral assurances to allow Koret to survive a motion for summary judgment.

Dior likens Koret's response to that which we found insufficient in *United States v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir.1982), where the claim of a genuine issue of fact was based solely on a general denial in the affidavit of an attorney "who concededly lack[ed] personal

knowledge" of the facts. *Id.* We noted in *Potamkin* that the resisting party "must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Id.* (quoting *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir. 1980)).

The affidavits submitted by Koret are more specific than the one in *Potamkin,* however. In conjunction with other evidence, they are enough to defeat Dior's motion. Specifically, Koret President Gordon, claiming personal knowledge of the facts, averred that

> lengthy negotiations between the parties over renewal terms ... broke down in early 1985. On several occasions, Colombe Nicholas, the President of Dior New York, confirmed to me that the December 31, 1984 termination date of the License Agreement would be extended for some period of time, between six months and eighteen months after December 31, 1984 in order to afford Koret an opportunity to recoup the extra investments in the Dior program which Koret made in 1983 and 1984. In other meetings ... extending into 1985 a full three (3) year renewal of the relationship was offered to Koret.

> .   .   .   .   .

> In reliance on these promises by Ms. Nicholas, Koret expended in excess of $400,000 over and above the obligations imposed on Koret by the License Agreement. In addition, at the suggestion and urging of Ms. Nicholas and of her superior at Christian Dior, S.A. in Paris, Jacques Rouet, Koret increased its inventory levels in order to be in a position to fill an increased volume of orders which was expected to result from the additional advertising, promotional and marketing activities Koret was undertaking. When Dior New York required Koret to make these additional investments in the program, it was clear to all concerned that these additional investments could not be recouped immediately and the impact of these promotional expenses would likely

be felt in 1985. At no time before January 1985 did any one from any of the Dior Companies suggest to any one from Koret that Koret should stop selling or manufacturing Dior merchandise nor at any time did Ms. Nicholas or Mr. Kriz revoke their earlier commitment to Koret that Koret would have an extension of the license beyond December 31, 1984 for some period of at least six months.

In addition, Gordon's supplementary affidavit stated that

> Nicholas repeatedly assured Koret there would either be a license renewal or extended sell-off period....

> Moreover, Koret's good faith belief that Ms. Nicholas would honor her promises of a license renewal or extended sell-off period was bolstered by the fact that when Koret had relinquished its Dior belt license in 1979 (a license which had the same boilerplate three-month sell-off provision), Dior gave Koret a full year to sell-off its remaining belt inventory (which had a value of approximately $60,000 or $1/10$th the value of the handbag stock at issue). This was the only precedent Koret had experienced and, after fourteen years of laboring for Dior New York, Koret had every reason to believe that Ms. Nicholas' promises to give Koret time to dispose of its inventory were consistent with Dior New York's practice and the custom of the industry. In fact, I am informed that in every other instance in which a Dior licensee has been terminated, Dior New York has given the former licensee sufficient time to dispose of its finished goods or acquired the inventory itself.

Koret Vice President Tillander's affidavit, also based on personal knowledge, contains similar plausible allegations. He stated:

> I was involved in many meetings with Colombe Nicholas and John Kriz from April 1983 through January 1985 concerning a renewal of the Distributorship/License Agreement dated as of March 3, 1980 (the "License Agreement") and possible arrangements which would

extend the license. On several occasions, Ms. Nicholas and Mr. Kriz indicated to me that it was imperative that Koret continue to make advertising and promotional commitments and increase Koret's sales of Dior products in order to justify a renewal of the License Agreement. In several conversations with Ms. Nicholas we discussed a six to eighteen month extension of the existing License Agreement in order to give Koret additional time to demonstrate that the substantial expenditures by Koret for advertising, promotion and marketing would result in increased sales and to permit Koret to recoup its investments in promoting and marketing the Dior line. Ms. Nicholas gave me assurances on several occasions that if Koret would continue to make these commitments that there would be a license renewal.... Koret in fact fulfilled these commitments at an out-of-pocket expense to Koret in excess of $400,000 (not including added inventory). Dior-New York, on the other hand, not only chose not to renew the license, but also refused to give Koret any time to sell off its inventory so as to recoup even part of its investment.

The affidavit of Koret's counsel, William J. McSherry, Jr., stated that

at no time prior to January 3, 1985 did the plaintiff notify the defendant to cease ordering merchandise and even the plaintiff's designated French supplier, Establissements P.J. Guene ("Guene") continued to deliver inventory to the defendant through May of [1985]—well after the three month sell-off period ended.

These affidavits must be viewed in light of the documentary evidence clearly establishing that such negotiations actually took place until they failed in early 1985. A letter from Tillander to Nicholas dated January 4, 1985, thus begins "Persuant [sic] to your request made during our meeting today, and in an effort to resolve the final issue remaining between Koret and Christian Dior regarding the renewal of the handbag license and distribution agreements...." Similarly, a letter from Dior's John M. Kriz to Koret's counsel dated December 27, 1984, states, "Over the past few months, there have been extensive correspondence and personal discussions between Christian Dior and Koret, Inc. and between counsel regarding the expiring [Agreement]...." While the claims of oral assurances regarding contributions to the advertising fund and Koret's increasing its inventory levels do not have such documentary verification, we believe the affidavits submitted are sufficiently specific in light of the verified existence of extensive discussions between the parties. Koret should be given an opportunity to prove at trial that Dior did in fact make the claimed assurances and is therefore estopped from prohibiting Koret's disposition of inventory.

### 2. Waiver and Modification

Koret contends that Dior's assurances that it would grant Koret additional time in which to sell off inventory amounted to a waiver of Dior's rights under Paragraph 16, or to a modification of the agreement. Judge Duffy rejected these defenses *sub silentio.* Both of these defenses are available under New York law, though Koret must overcome a contractual obstacle in order to prevail on either. The agreement states, "None of the terms of this agreement shall be deemed to be waived or modified ... except by an express agreement in writing signed by a person authorized to that effect by the party against whom enforcement of such waiver, modification, etc., is sought."

Koret contends that it can overcome this no-oral-waiver-or-modification provision because "[i]n New York the doctrine is well established that, even where a contract provides that there shall be no waiver or amendment not evidenced by a writing, 'the prohibition of oral waiver may itself be waived.'" *Neonex International, Ltd. v. Norris Grain Co.,* 338 F.Supp. 845, 853 (S.D.N.Y.1972) (quoting *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 387, 122 N.E. 378, 381 (1919)).

Koret must also be given an opportunity to prove its waiver defense at trial.

"To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it." *Voest-Alpine International Corp. v. Chase Manhattan Bank, N.A.,* 707 F.2d 680, 685 (2d Cir.1983) (citations omitted). It is clear that Dior knew of the existence of the right; less clear, of course, is its intention to relinquish it. In view of Nicholas' alleged oral assurances and of the letters that confirm that negotiations were continuing, Koret should have been given a chance to convince a trier of fact of Dior's intent to waive. Under the circumstances, it was error for the district court to have resolved the question of Dior's intention without a trial. *See Patrick v. LeFevre,* 745 F.2d 153, 158–59 (2d Cir.1984); *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9–10 (2d Cir.1983); *In re Credit Industrial Corp.,* 366 F.2d 402, 411 (2d Cir.1966).

■ Because of the contract's prohibition of oral modification, a claim of contract modification must allege that there has been partial performance of the modification that is " 'unequivocally referrable to the oral agreement to modify.' " *Grandonico v. Consortium Communications International, Inc.,* 566 F.Supp. 1288, 1291 (S.D.N.Y.1983) (quoting *Rose v. Spa Realty Associates,* 42 N.Y.2d 338, 345, 366 N.E.2d 1279, 1284, 397 N.Y.S.2d 922, 927 (1977)). Koret claims that by contributing to an advertising fund and increasing its inventory, it took steps that made no sense absent assurances from Dior that it would be permitted to recoup these investments. Thus, it contends that its part performance unequivocally referred to the modification. Dior responds, and the district court found (albeit in connection with its rejection of the estoppel defense), that Koret simply took these steps at its own risk in the mistaken belief that the negotiations would produce a new agreement. This may be a close call, but that call should be made by a trier of fact at trial.

\* \* \* \* \* \*

The grant of summary judgment is reversed. Whether the injunction shall remain in force is left to the discretion of the district court.