**U S WEST FINANCIAL SERVICES, INC., Plaintiff,**

v.

**MARINE MIDLAND REALTY CREDIT CORPORATION and Days Bakersfield Limited Partnership, Defendants.**

**MARINE MIDLAND REALTY CREDIT CORPORATION, Plaintiff,**

v.

**U S WEST FINANCIAL SERVICES, INC., Defendant.**

**Nos. 90 Civ. 5357 (MBM), 91 Civ. 1837 (MBM).**

United States District Court, S.D. New York.

Jan. 25, 1993.

---

Joel M. Miller, Charles R. Jacob III, James P. Rosenzweig, Miller & Wrubel P.C., New York City, for U S West Financial Services, Inc.

M. Duncan Grant, Matthew H. Adler, Margaret A. Suender, Michael S. Hino, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Marine Midland Realty Credit Corp.

## OPINION AND ORDER

MUKASEY, District Judge.

These actions arise out of a conditional standby mortgage loan commitment by U S West Financial Services, Inc. to Days Bakersfield Limited Partnership ("Days"), an entity formed to construct a Days Inn hotel in Bakersfield, California. U S West moves for summary judgment (1) declaring that it was not required to fund the standby loan as stated in its First and Third Causes of Action in 90 Civ. 5357, and (2) dismissing claims in 91 Civ. 1837 by Marine Midland Realty Credit Corporation ("Marine"), the construction lender to Days, for breach of contract and breach of duty of good faith. In a previous opinion, familiarity with which is assumed, this Court granted summary judgment for U S West against other defendants. *U S West Fin. Servs., Inc. v. Tollman*, 786 F.Supp. 333 (S.D.N.Y.1992).

On November 18, 1992 this Court denied U S West's motion for summary judgment in these actions. *U S West Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.*, Nos. 90 Civ. 5357, 91 Civ. 1837 (S.D.N.Y. November 18, 1992). U S West moves for reargument of that portion of this Court's November 18, 1992 decision which pertains to the issue of damages. Because of an ambiguity in one paragraph of that decision, and because the parties overlooked—in both their summary judgment memoranda and their initial memo-

randa on motion for reargument—numerous arguments and cases, including a major Second Circuit decision on the issue of damages, *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820 (2d Cir.1990) (Winter, J.), U S West's motion for reargument is granted, the November 18, 1992 decision is withdrawn, and this decision is substituted. Nonetheless, for the reasons stated below, U S West's motion for summary judgment is denied.

## I.

This case is a dispute about three connected but conflicting documents. In the first document, a contract dated February 13, 1987, as amended on February 17, April 23 and 28, 1987 (collectively, the "Commitment"), U S West, for an $87,500 fee, committed to provide to Days, on 45 days notice before the expiration date of a loan to Days, a standby mortgage loan of up to $8.75 million (the "Standby Loan"), conditioned upon Days providing to U S West certain documents and meeting certain financial conditions. (Miller Aff. Ex. 1) In the second document, a letter dated April 23, 1987, Marine agreed to lend $8.45 million to Days for construction of a Days Inn hotel in Bakersfield, California. (Grant Aff. Ex. 2) In the third document, a contract also dated April 23, 1987 (the "Three–Party Agreement"), U S West, Days, and Marine agreed that U S West's obligation to fund the Standby Loan (and thereby refinance Marine's loan to Days) expired on April 23, 1990, and U S West agreed that "[i]f [Days] is in default under the Agreement or the Commitment and the default is curable, ... [U S West] shall have notified [Marine] of such default ... and [provided] 30 days after receipt of written notice from [U S West] to cure such default...." (Grant Aff. Ex. 11 ¶ 7.2) None of the three documents defined "default" or "curable." (Marine Rule 3(g) Statement ¶¶ 10–11).

The Commitment is incorporated by reference into the Three–Party Agreement (Miller Aff. Ex. 2, ¶ 1 and Recitals), and those documents should be read together. *See Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 233 (2d Cir.1991) ("instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together").

The Days Inn Bakersfield hotel was completed in 1988, and soon began a gradual financial decline. (U S West Mem. at 4; Marine Mem. at 12) On March 5, 1990, less than 45 days before the expiration of Marine's loan to Days, Marine requested that U S West fund the Standby Loan. (Grant Aff. Ex. 12) On April 17, 1990, U S West notified Days that its obligation to fund the Standby Loan had terminated, because Days was in default under the Commitment and the Three–Party Agreement. (Grant Aff. Ex. 13).

U S West sought a declaration that it was not required to fund the loan. Marine never foreclosed on the loan to Days; rather, it sued U S West for breach of contract and breach of good faith. On October 17, 1991, Marine sold its right to foreclose on the loan to Days to Oleifera Investments, Ltd. for $4.65 million. (Marine Rule 3(g) Statement ¶ 73).

A standby loan, also known in the banking industry as a take-out commitment, is issued expressly to enable a builder to obtain construction financing. Such a commitment is designed to encourage a construction loan by assuring a construction lender that its loan will be paid at the end of its term by the standby lender. *See, e.g., First Nat'l State Bank v. Commonwealth Fed. Sav. & Loan Ass'n*, 455 F.Supp. 464, 467 (D.N.J.1978), *aff'd*, 610 F.2d 164 (3d Cir.1979). Thus, subject to certain conditions, Marine was entitled to have its loan funded by U S West's Standby Loan on April 23, 1990. According to the contract terms, U S West would then assume the risk of default by Days.

## II.

U S West claims that because "the undisputed facts show that Marine was not damaged by any alleged breach of contract," even if U S West breached an obligation to fund the Standby Loan, it is nevertheless

entitled to summary judgment on the issue of damages. (U S West Mem. at 23).

### A.

■ Under New York law, "[t]he basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed." *Teachers Ins. & Annuity Ass'n v. Butler*, 626 F.Supp. 1229, 1236 (S.D.N.Y.1986) (citations omitted). This principle is modified by the "fundamental proposition of contract law ... that the loss caused by a breach is determined as of the time of breach." *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 825 (2d Cir.1990) (citing *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 269 N.E.2d 21, 26, 320 N.Y.S.2d 225, 232 (1971)). A showing of a breach of contract alone does not necessarily entitle a plaintiff to damages. *See, e.g., Lincoln Nat'l Life Ins. Co. v. NCR Corp.*, 772 F.2d 315, 320 (7th Cir.1985); *Meteor Indus., Inc. v. Metalloy Indus., Inc.*, 149 A.D.2d 483, 539 N.Y.S.2d 972 (2d Dep't 1989). Rather, "[t]he proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach." *Simon v. Electrospace*, 28 N.Y.2d at 145, 269 N.E.2d at 26, 320 N.Y.S.2d at 232.

■ The parties' approach to these principles, what with radical shifts of position and theory, has resembled more libretto than legal argument. Nevertheless, the parties' arguments have evolved to clarify the damages issue and they merit description.

U S West argued first in its summary judgment motion that Marine's damages must be "based on the difference, on the date of the alleged breach, between the amount of the [loan] and the value of the [loan property]." (U S West Mem. at 25) Marine responded that summary judgment was not warranted because of disputed fact issues regarding the value of the loan property at the time of breach. (Marine Mem. at 94–105) U S West maintained that the only evidence in the record showed that Marine was not damaged, (U S West Reply at 38) but this Court denied U S West's motion for summary judgment in a decision which included a nine-page discussion of the damages issue. *U S West Fin. Servs., Inc. v. Marine Midland Realty Credit Corp.*, Nos. 90 Civ. 5357, 91 Civ. 1837 (S.D.N.Y. November 18, 1992).

U S West recommenced the dispute about damages on December 3, 1992, when it moved for reargument to clarify one paragraph of this Court's November 18, 1992 decision. (U S West Rearg. Mem. at 6) Marine rejoined with a new theory: " 'the value of the loan property' to Marine at the time of the breach [i]s measured not by the appraised or market value of the property, but rather, by the value, at that time, of its *interest* in the property, which consisted of its mortgage lien." (Marine Rearg. Mem. at 2) Marine supported this theory with lengthy affidavits and exhibits detailing California's costly procedure for foreclosing on a mortgage lien. In its reply, U S West argued that Marine's new theory was invalid, and quoted extensively from *Sharma*—the first reference by either party in these proceedings to Judge Winter's recent and highly relevant opinion on computing damages. (U S West Rearg. Reply Mem. at 7–12) On January 15, 1993 Marine filed its purported *coup de grace*, a surreply distinguishing *Sharma* from these proceedings. (Marine Rearg. Surreply Mem. at 1–3).

U S West's current position is that Marine's damages are the value of the loan minus the value of the loan property on the date of breach. Marine's current position is that its damages are the value of the loan minus the value of its right to foreclose on the date of breach.

Although the parties have documented extensively the damages issue, and thereby equipped the trier of fact in this case with copious factors to consider in computing damages, they have not articulated the proper measure of damages in this case. As stated above, the proper measure of damages is determined by the loss sustained by Marine at the time of breach. *Simon v. Electrospace*, 28 N.Y.2d at 145, 269 N.E.2d at 26, 320 N.Y.S.2d at 232.

Applying this measure, the value of the loss sustained by Marine at the time of the alleged breach is equal to the value of the additional risk Marine was forced to assume, after breach, that Days would default and that Marine would have to either foreclose or sell its right to foreclose. In other words, Marine was damaged by the value on the date of breach of its right to have the loan to Days monetized. Because Marine's damages are the amount needed to compensate it for the additional risk it was forced to assume on the date of breach, its damages depend on the value of the loan property *and* the value of the right to foreclose on the loan property, in addition to other factors such as the value of the loan and the status on the date of breach of the real estate market, interest rates, and expectations about the probability that Days would not repay the loan.

Put another way, the damages to Marine are the value on the date of breach of U S West's performance in funding the loan—irrespective of any subsequent events. Only this value incorporates the value of the loan property, the value of the right to foreclose, and the probability that Days would not repay the loan. By contrast, the parties' proposed measures of damages simply assume that Days would not have repaid the loan, as it ultimately did not. As Judge Winter explained in *Sharma,* measuring contract damages by the value of the asset at the time of breach takes into account future expectations because the value of an asset is the discounted value of the stream of future income that the asset is expected to produce. *Sharma,* 916 F.2d at 826. In this case, the value of the asset—Marine's right to the Standby Loan—at the time of breach depends on the future expectations about whether Days would repay the loan. The parties' measures of damages do not take into account future expectations that Days might repay or renegotiate the loan to avoid foreclosure; rather, they assume no repayment. The proper measure of damages is based on the value of Marine's right to the Standby Loan: the difference between the value of the loan and the discounted value of the stream of income expected from the

loan to Days, including future expectations about repayment. *Id.*

Accordingly, that Days did not repay its loan is not dispositive of the damages to Marine. When U S West breached the contract, it forced Marine to assume some risk that Days would not repay. However, there was also some chance that Days would repay the loan. In computing damages, New York courts have rejected explicitly the use of changes in the value of assets subsequent to breach. *See, e.g., Sharma,* 916 F.2d at 825 (refinancing); *Lotito v. Mazzeo,* 132 A.D.2d 650, 651, 518 N.Y.S.2d 22, 23 (App.Div.2d Dep't 1987) (real estate); *Webster v. DiTrapano,* 114 A.D.2d 698, 699, 494 N.Y.S.2d 550, 551 (App.Div.3d Dep't 1985) (real estate); *Aroneck v. Atkin,* 90 A.D.2d 966, 967, 456 N.Y.S.2d 558, 559 (App.Div. 4th Dep't 1982) (securities).

■ The measure of damages U S West proposes—loan value minus loan property value—is incorrect because it assumes certainty on the date of breach that Days would default, and places upon Marine the entire cost and risk associated with foreclosing on the loan property. If a contract is for the sale of property, damages due to breach are measured by the value of the property on the date of breach, because the non-breaching party is deprived of its entitlement to the property. *See Webster,* 114 A.D.2d at 699, 494 N.Y.S.2d at 551. However, at the time of breach, Marine was not deprived merely of its entitlement to the loan property; rather, it was deprived of its right to have its loan funded, a right which includes the right *not* to expend resources necessary to foreclose on the loan property. Therefore, if one applies U S West's measure, Marine can never be made whole following a breach, because Marine can never foreclose immediately and costlessly to *recover the entire loan property value.* Moreover, if one applies U S West's measure, if a standby lender expects both that a borrower will default and that the value of the loan property will not appreciate significantly, then the standby lender will always breach. The difference to a standby lender between the loan value and the

loan property value on the date of breach (the damages the standby lender must pay) will not exceed its estimate of the value of the rights of the lender (to foreclose if the borrower defaults) unless the standby lender expects that the value of the property will appreciate significantly. Because standby lenders who expect default normally should not expect significant appreciation in the value of loan property, U S West's measure would assure defaults, and thereby impair the credit market for construction loans.

Marine's proposed measure of damages—loan value minus right-to-foreclose value—is incorrect also, because it assumes default and places upon U S West the entire cost and risk associated with foreclosing on the loan property, even if Days would have repaid the loan to Marine. If the contract had been for the sale of a mortgage on the property, then damages *might* be measured by the value of the right to foreclose at the time of breach, an issue this Court need not decide. *See Golbar Properties, Inc. v. North American Mortgage Investors*, 78 A.D.2d 504, 431 N.Y.S.2d 820 (1st Dep't 1980), *aff'd*, 53 N.Y.2d 856, 440 N.Y.S.2d 180, 422 N.E.2d 825 (1981). However, again, at the time of breach, Marine was not deprived merely of its entitlement to foreclose on the loan property; it was deprived of its right to have its loan funded, as described above. A standby lender who anticipated Marine's measure of damages would lend, if at all, only at an interest rate high enough to compensate for the additional risk of liability for Marine's foreclosure costs and any decline in the value of the loan property subsequent to a breach. New York courts have upheld damage awards based on "what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach" and have rejected awards based on what "the actual economic conditions and performance" were in light of hindsight. *Sharma*, 916 F.2d at 826 (quoting *Aroneck*, 90 A.D.2d at 967, 456 N.Y.S.2d at 559). New York courts have refused to adopt a "wait and see" theory of damages. *Id.*

To clarify this discussion, consider the following hypothetical example: X possesses both (1) some real, personal, or intangible property right (the "Asset"), and (2) a contractual right to transfer this Asset to Y for a certain price (the "Contract Price"). If Y breaches, X is deprived of its contractual right to transfer the Asset, but retains the Asset. Therefore, X is entitled to recover the Contract Price to which X was entitled minus the value of the Asset X retained at the time of breach. X is not entitled to recover any amount based on the value of the Asset after breach.

New York cases apply the analysis in this example. For example, *Webster v. DiTrapano*, 114 A.D.2d 698, 699, 494 N.Y.S.2d 550, 551 (App.Div. 3d Dep't 1985), can be described as follows. X possesses (1) a house, and (2) a contractual right to sell the house to Y for $63,500. At the time Y breaches, the house is worth $57,500. Therefore, X may recover only $6,000, the Contract Price minus the value of the Asset at the time of breach, even if X was able to sell the house after B's breach only for $55,000.

These proceedings follow the example as well. Prior to U S West's alleged breach, Marine possessed (1) an Asset—its rights under the loan agreement with Days—including the right to foreclose on the loan property if Days defaulted, and (2) the right to sell that Asset to U S West at the Contract Price, the amount of the Standby Loan. If U S West breached, then Marine was deprived of its right to sell its Asset at the Contract Price, but retained the Asset—its rights under the loan agreement with Days. Accordingly, Marine would be entitled to the amount of the loan minus the value of its right to have the loan funded by U S West.

Finally, U S West relies on the policy behind *Sharma* that "the efficiency of the credit market will be impaired if a measure of damages other than the value of the collateral at the time of breach were applied to secured financing agreements." 916 F.2d at 826. U S West is correct that "[u]nder the rule espoused by [Marine], lenders would have to take into account the

risks of post-foreclosure litigation involving the value of the collateral at some unknown future time. [This rule] would thus benefit neither lenders nor borrowers, because it would render secured loans more risky, thereby impairing the availability of credit and increasing interest rates." 916 F.2d at 827.

However, U S West is incorrect that *Sharma* stands for the proposition that the measure of damages will always be based on the value of the collateral. For example, damages for the breach of an option contract are not based on the value of the underlying shares at the time of breach, but rather on the value of the option to acquire those shares at a particular price and time. The proposition for which *Sharma* stands is that damages are based on the value of the rights of which the non-breaching party was deprived, valued at the time of breach, excluding subsequent changes in value. 916 F.2d at 826. In *Sharma*, a borrower sued its lending bank, alleging that the bank breached a financing agreement which the parties had renegotiated after the borrower defaulted on its original loan. The bank had sold the collateral—three ships—and the borrower sought to recover, not the value of the ships on the date of breach, but the profits it claimed the ships would have generated. By comparison, Judge Winter reasoned that "under New York law, if the contract in question were for the sale of the vessels to appellants and the seller were to breach the contract, appellants' recovery would be limited to the value of the vessels on the date of the breach." *Id.* Because the Court found that damages should be measured by the value of the ships at the time of breach, Judge Winter could "see no reason to reach a different result in the instant matter." *Id.*

Similarly, if the contract in this case were for the sale of the property, recovery would be limited to the value of the property on the date of breach. Also, this limited measure of damages would apply if, as in *Sharma*, a borrower (Days) who was entitled to the loan property had sued the lending bank. Neither of these situations is this case here. Marine was deprived

neither of its right to the loan property nor of its right to foreclose on the loan property. Rather, Marine was deprived of its right to the Standby Loan. Therefore, recovery must be measured by the value of this right. Thus, the stark contrast between the proper measure of damages in this case and the proper measures in *Sharma* and cases cited therein is "reason to reach a different result in the instant matter." *Id.*

**B.**

■ Although this Court does not apply U S West's proposed measure of damages, U S West's contention remains that Marine was not damaged on April 23, 1990, the date of breach, because the loan property was worth $8.5 million at that time, slightly more than the outstanding principal amount of the loan. Accordingly, U S West claims that had Marine foreclosed on the property on April 23, 1990, it would not have been damaged. U S West asserts that "the undisputed evidence is that the value of the mortgage ... equalled or slightly exceeded the outstanding principal amount of [Marine's loan] as of the date of the breach." (U S West Mem. at 28) U S West asserts that this "undisputed evidence" entitles it to summary judgment because Marine would not be able to prove damages. *Katz Comm., Inc. v. Evening News Assoc.*, No. 79 Civ. 5931 (JMC) slip op. (S.D.N.Y. June 3, 1982).

However, the only undisputed facts related to damages are as follows: the outstanding principal amount of Marine's loan to Days on April 23, 1990 was $8.45 million; U S West breached the contract, if at all, on April 23, 1990 or before; and Marine sold its loan to Oleifera Investments for $4.65 million on October 17, 1991. (U S West Rule 3(g) Statement ¶ 47, Miller Aff. Ex. 57 at 7, Grant Aff. Ex. 66 at 12–13) The other "facts" to which U S West refers are three appraisals of the loan property, none of which valued the property as of April 23, 1990. Marine commissioned these three appraisals, one by Joseph J. Blake and Associates, Inc., and two by Cushman & Wakefield, Inc.:

| Appraiser | Date Property Valued as of: | Appraised Value |
|---|---|---|
| Joseph J. Blake | August 1, 1990 | $8.5 million |
| Cushman & Wakefield | December 11, 1990 | $5.8–$6.1 million |
| Cushman & Wakefield | July 8, 1991 | $5 million |

Contrary to assertions by U S West and Marine, these appraisals are not conclusive evidence of the value of property on April 23, 1990. That value is a fact determination based, among other things, on the appraisal estimates, the condition of the real estate market, and the presence or absence of willing purchasers at that time. The Blake appraisal is *some* evidence that the property was worth $8.5 million on August 1, 1990. (U S West Rule 3(g) Statement ¶ 51; Miller Aff. Ex. 56 at 2) Likewise, the Cushman & Wakefield appraisals are *some* evidence that the property was worth considerably less several months later, and that the Blake appraisal overvalued the property by 28% to 32%. (Grant Aff. Ex. 61 at 2) The value of the property on April 23, 1990 is a material issue of fact that cannot be gleaned from the appraisals without dispute.

Fed.R.Civ.P. 56(c) requires a summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The disputed issues of fact must be "material to the outcome of the litigation," *id.* at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

According to U S West, "[i]n order to withstand [its] summary judgment motion as to its damage claim, Marine is required to offer proof at this time of the value of the Bakersfield project *as of April 1990*." (U S West Reply at 40) (emphasis in original) Because the appraisals valued the property not as of April 1990, but rather four to 15 months later, they do not conclusively establish the April 1990 value. On a motion for summary judgment, in order "to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). Marine is required to produce evidence sufficient to establish the existence of damages, an element essential to its case, on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Applying the proper measure of damages described

above, the evidence produced, though not conclusive as to value of the property, is sufficient to forestall summary judgment on the issue of damages, because the value of the property is at least one ingredient for computing the damage to Marine.

### C.

■ U S West claims further that Marine, by selling its mortgage lien rather than foreclosing on it, waived any right to sue U S West for damages. (U S West Mem. at 3, 29) According to U S West, New York law "requires a secured creditor to foreclose on its mortgage *before* recovering any deficiency judgment against the mortgagor, guarantor or other person (such as a standby lender) who may be liable to the mortgagee." (U S West Mem. at 26) (emphasis in original).

This approach ignores both law and commercial reality. Marine was not required to foreclose on the property. Rather, Marine was entitled to make an election of remedies under the New York Real Property Actions and Proceedings Law. RPAPL § 1301. According to the New York courts, Section 1301 "requir[es] the holder of a note and mortgage to make an election of remedies—either to foreclose on the mortgage or to recover on the note." *First Fidelity Bank, N.A. v. Best Petroleum, Inc.*, 757 F.Supp. 293, 296 (S.D.N.Y.1991). Section 1301 prevents a mortgagee of real property from seeking to enforce rights upon default by pursuing a legal remedy and an equitable remedy at the same time. *See United States v. Whitney*, 602 F.Supp. 722, 730 (W.D.N.Y.1985). Accordingly, Marine elected to attempt to recover on the note, rather than to foreclose on the property. Moreover, Marine is suing for breach of contract and breach of the duty of good faith, both of which arguably are unaffected by Section 1301 and therefore would be unaffected by U S West's argument that that section required Marine to foreclose before it sued.

### D.

Finally, U S West claims that if Marine recovers damages, Oleifera Investments, the purchaser of Marine's right to foreclose on the loan property, may "recover an amount greater than the difference between the Construction Loan balance and Marine's recovery ... damages that may not actually exist." (U S West Reply at 41) Presumably, according to U S West, Marine could recover the $3.3 million in damages it is claiming *and* Oliefera Investments could foreclose on the potentially valuable loan property.

■ U S West's concern is misplaced and does not support summary judgment. The trier of fact may not award such a double recovery. Under New York law, a party injured by breach of contract is "required to make a reasonable effort to mitigate its damages." *Tynan Incinerator Co. v. Int'l Fidelity Ins. Co.*, 117 A.D.2d 796, 797, 499 N.Y.S.2d 118, 120 (1986). "It has long been the rule that where there has been a breach of contract, the party who suffers damage by reason of the breach has a duty to minimize the damages [and any] award of damages should be reduced by any unnecessary increase in damages due to the failure of the plaintiff to avoid them." *Golbar Properties, Inc. v. North American Mortgage Investors*, 78 A.D.2d 504, 505, 431 N.Y.S.2d 820, 822 (1st Dep't 1980), *aff'd*, 53 N.Y.2d 856, 440 N.Y.S.2d 180, 422 N.E.2d 825 (1981).

Marine claims that it "lost more than $3,300,000 on the loan transaction, not including unpaid interest and late charges." (Marine Mem. at 16) Marine deduces this figure from the difference between the principal amount of the construction loan and the purchase price it received from the sale of its interest in the loan. As discussed above, this deduction applies an incorrect measure of damages.

■ Nevertheless, Marine claims that it received the Blake appraisal on September 7, 1990, and, "believing it flawed, it quickly requested a limited scope review of this appraisal by Cushman & Wakefield, Inc." (Marine Mem. at 95; Marine Rule 3(g) Statement ¶ 68) With the hotel market in further decline, marine asked Cushman & Wakefield to reevaluate the property in the summer of 1991. Marine argues that it

subsequently mitigated its damages by selling a participation interest in the loan to Oleifera Investments for $4.65 million, a price that was supported by the second Cushman & Wakefield appraisal. (Marine Mem. at 104) Whether Marine's sale of the participation interest was "reasonable" presents a material question of fact, one which may result in a reduction of damages at trial.

### III.

U S West next claims that it is undisputed that the Commitment, and therefore its obligation to fund the Standby Loan, expired without Days satisfying certain express conditions. (U S West Mem. at 3).

### A.

■ On April 17, 1990, U S West informed Days and Marine that Days was in default under both the Commitment and the Three–Party Agreement, because conditions to U S West's obligation to fund the Standby Loan had not been satisfied. (U S West 3(g) Statement ¶ 45; Miller Aff.Exhs. 48, 49) U S West argues that, consequently, its obligation to fund the Standby Loan was terminated on April 17, 1990. (U S West Mem. at 19).

Pursuant to the Commitment, Days was required to provide to U S West the following documentation to prove that certain conditions to U S West's funding obligation were met: a certified copy of its annual financial statement, an environmental report, an architect's certificate, and a statement of certain guarantors' contingent liabilities and unrestricted cash deposits. The deadlines for producing these documents varied from two to three weeks prior to the expiration date of the loan. (Miller Aff.Ex. 1) Days was also required to satisfy certain net worth and cash requirements. (Miller Aff.Ex. 1).

With respect to net worth and cash requirements, U S West claims that the financial conditions were not satisfied, and Marine disputes U S West's methods of calculation. (Marine Mem. at 62–85) The parties dispute various aspects of the calculations, including the proper measuring

dates, the extent to which access to cash was unrestricted, and the effect of the alleged ripening of certain contingent liabilities. This dispute presents genuine issues of fact with respect to whether the conditions prescribing net worth and cash requirements were met.

■ With respect to the other conditions in the Commitment, U S West is correct that it is undisputed that Days did not provide the required documentation. (U S West Mem. at 3, 7–12) The Commitment provided that "[t]his Agreement shall terminate and be null and void unless the Standby Loan is closed and funded on or before April 23, 1990 (the 'Closing Deadline')". (Miller Aff.Ex. 2 at 4) "In no event shall the period for [Marine] curing such a default extend beyond 10 days prior to the Closing Deadline...." (Miller Aff. Ex. 2 at 17) Therefore, relying only on the Commitment, U S West argues it is entitled to summary judgment because its obligation to fund the Standby Loan expired on April 23, 1990. *See, e.g., Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 708 F.Supp. 612 (S.D.N.Y.1989), *aff'd,* 894 F.2d 516 (2d Cir.1990); *Penthouse Int'l, Ltd. v. Dominion Federal Savings & Loan Ass'n,* 855 F.2d 963 (2d Cir.1988), *cert. den.,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 154 (1989).

However, the Commitment is not the only document in this case. The Three–Party Agreement, though connected to the Commitment in time and substance, contains provisions which conflict directly with the requirements in the Commitment described above. Specifically, Paragraph 7.2 of the Three–Party Agreement required U S West to provide to Marine notice of any defaults by Days and to give Marine 30 days in which to cure any such default, before U S West may refuse to fund the loan based upon such a default:

If Borrower [Days] is in default under the Agreement or the Commitment and the default is curable, [U S West] agrees that it will not terminate the Commitment or its obligations hereunder or take other action in conflict with full satisfaction of its obligation under the Agree-

ment, unless [U S West] shall have notified Bank [Marine] of such default and Bank shall have failed within 30 days after receipt of written notice from [U S West] to cure such default....

(Grant Aff.Ex. 11 ¶ 7.2).

It is undisputed that U S West did not provide to Marine notice and an opportunity to cure within 30 days of April 23, 1990. Therefore, if one were to look only at the terms of the Three–Party Agreement, Marine might be entitled to summary judgment on its breach of contract claim. The *Towers* and *Penthouse* cases cited above are distinguishable from this situation, because neither case involved a provision requiring notice to a third party and an opportunity for that party to cure prior to termination. Because of the direct clash between the Commitment and the Three–Party Agreement, the intent of the parties is obscure and there are disputed issues of fact as to whether Marine was entitled to notice of or could have cured any default by Days.

### B.

■ Moreover, because the terms "default" and "curable" are not defined in the documents, there are disputed issues of fact as to what those terms mean. Summary judgment is not appropriate when there are unresolved issues as to a party's intent. *Lanvin, Inc. v. Colonia, Inc.*, 776 F.Supp. 125, 127 (S.D.N.Y.1991).

Marine reads these terms broadly. Marine claims that it "did not intend ... that the notice obligations would distinguish between certain types of defaults, other than curable and non-curable defaults." (Marine Mem. at 8 n. 3; Eastburn Dep. at 162–63) Marine also claims that "[i]t is clear, however, that Marine intended this term ['curable'] to be applied in the broadest sense...." (Marine Mem. at 41–42 n. 12; Grant Aff.Ex. 10; Eastburn Dep. at 163–66) Finally, Marine claims that according to undisputed testimony, if U S West had given it notice that U S West considered Days to be in default, together with an opportunity to cure, it would have acted immediately to cure those defaults. (Ma-

rine Mem. at 41–42) A genuine issue of fact exists as to whether Marine could have cured the alleged defaults given the opportunity to do so. *See Lanvin, Inc. v. Colonia, Inc.*, 776 F.Supp. 125, 127 (S.D.N.Y. 1991) (denying summary judgment where party failed to comply with notice requirements—whether defaulting party could have cured default presented issues of fact).

In contrast, U S West reads these terms narrowly. U S West argues that Marine would have been entitled to 11 days at most in which to cure the non-delivery of documents. (U S West Mem. at 39–40) U S West's position is based upon its interpretation of the interplay between the document delivery deadline (three weeks prior to closing) and the provision that "the period for curing such a default [not] extend beyond 10 days prior to the [expiration date]. (Miller Aff.Ex. 2 ¶ 7.2) This interpretation of the notice provision directly contradicts the plain language of Paragraph 7.2, which requires 30 days notice and an opportunity to cure. U S West asserts that it did not need to give notice, because Marine knew that the documents had not been timely delivered. However, all notices were required to be in writing, (Grant Aff.Ex. 11, ¶ 16.4) and knowledge of lateness is not equivalent to knowledge of default. Moreover, whether and what Marine knew are themselves material issues of fact.

What the parties intended that "default" and "curable" mean is a question of fact for trial, but the cases provide some guidance. A default is an "omission or failure to perform a legal or contractual duty ... [or] to observe a promise or discharge an obligation (*e.g.*, to pay interest or principal on a debt when due)." Black's Law Dictionary 376 (5th ed. 1979) Few courts have dealt with written agreements that contained the terms "default" and "curable," but did not define them. Because "default" is not defined anywhere in the U.C.C., the parties' definition normally governs that term's meaning. *See Manufacturers Hanover Leasing Corp. v. Ace Drilling Co.*, 726 F.Supp. 966, 968

(S.D.N.Y.1989) (citing cases). One court interpreted "default" to mean only a failure to repay. *Jefferds v. Ellis*, 127 Misc.2d 477, 483–84, 486 N.Y.S.2d 649, 655 (1985) ("absent a specific inclusion in the security agreement, the court will give to the abstract term 'default' only the generally accepted meaning of failing to perform or pay"). Another court recently noted that:

> The term 'default' does not necessarily contemplate any legal duty to act. For example, a defendant who fails to timely answer has 'defaulted' even though the defendant had no legal duty to appear. The term 'default' does, however, contemplate that a loss of some kind may be suffered by the party failing to act. Hence, any failure to act where that failure results in adverse consequences to the non-acting party is a default.

*In re O'Neal*, 142 B.R. 411, 414 (Bankr. D.Ore.1992). The Third Circuit has upheld a grant of summary judgment under New York law where the term "default" was undefined; however, the term "Event of Default" *was* defined and this persuaded the court that the meaning of "default" was plain and unambiguous. *Derry Finance, N.V. v. Christiana Cos., Inc.*, 797 F.2d 1210 (3d Cir.1986).

The meaning of "curable" depends closely on the meaning of "default." In one case, the Second Circuit explained that "cure," as used in the Bankruptcy Code, relates to the event which triggered a default. *In re Taddeo*, 685 F.2d 24 (2d Cir. 1982). Another court noted that by providing for a cure the debtor can restore the status quo ante as if the default had never occurred. *In re O'Neal*, 142 B.R. 411, 413–414 (Bankr.D.Ore.1992). Under the U.C.C., "cure" is "[t]he right of a seller ... to correct a non-conforming delivery of goods to buyer within the contract period." Black's Law Dictionary 344 (5th ed. 1979).

### C.

■ Finally, Marine argues that U S West waived its right to demand delivery of the documents required by the Commitment, and that Marine relied upon that waiver in not taking action to ensure such delivery. (Marine Mem. at 19) "To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intent to relinquish it." *Christian Dior–New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 40 (2d Cir.1986) (citing *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir.1983)).

The evidence indicates that U S West knew of and intended to relinquish at least some of its rights under the Commitment. According to one of U S West's counsel, "U S West had the right to terminate this transaction long before April 17. It chose not to." (Grant Aff.Ex. 18, Lehrer Dep. at 129) U S West was aware that certain documents would be delivered after the delivery deadline, and it continued to request delivery after that deadline. (Lehrer Dep. at 119, Marine Rule 3(g) Statement ¶ 16, Sokol Dep. at 65–66) Therefore, Marine argues, "U S West's conscious decision not to enforce its claimed right to terminate as soon as the ... deadline had passed ... constituted a waiver as a matter of law of U S West's right to terminate the Commitment on the basis of such late delivery." (Marine Mem. at 25).

■ Section 16.6 of the Three–Party Agreement provides that "[n]o waiver of any of the terms or conditions of this Agreement, and no waiver of any default or failure of compliance, shall be effective unless in writing...." (Miller Aff.Ex. 1 § 16.6) In general, under New York law, "a written agreement that expressly states it can be modified only in writing cannot be modified orally." *Towers*, 894 F.2d at 522. An exception to this general principle is that "when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification be in writing." *Id.* The conduct claimed to have been performed in reliance on the oral modification must unequivocally refer to the modification, not the original writing. *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 344, 397 N.Y.S.2d 922, 927, 366 N.E.2d 1279, 1283 (1977).

The actions described above are not consistent with the written agreements. These actions indicate that U S West induced Marine to rely on its representation that the Commitment was not terminated; consequently, Marine did not immediately cure any default by Days. U S West repeatedly requested, after the delivery deadline had passed, that the documents be delivered as soon as possible. Marine contends that Section 16.6 is inapplicable because "[i]n New York the doctrine is well established that, even where a contract provides that there shall be no waiver or amendment not evidenced by a writing, 'the prohibition of oral waiver may itself be waived.'" *Christian Dior*, 792 F.2d at 39 (citing cases). U S West's failure to enforce its rights generates issues of fact as to whether it waived Section 16.6 or the "time of the essence" clauses in the Commitment and the Three–Party Agreement. (Miller Aff.Ex. 1 ¶ C.28; Ex. 2 ¶ 16.7) *See Zamoiski Co. v. Tenavision, Inc.*, No. 84 Civ. 323 (BN), 1986 WL 10274 (S.D.N.Y. Sept. 9, 1986).

Marine claims that before U S West sent its letter of termination of April 17, 1990, U S West never told Marine that it was planning to terminate its obligations under the Commitment. (Lehrer Dep. at 157; Eckman Dep. at 158–159) At a minimum, there is a genuine issue as to whether U S West waived its right to demand that the documents in question be delivered on or before the delivery dates set forth in the Commitment and to terminate on the basis of late delivery. *See Christian Dior*, 792 F.2d at 39 (reversing a grant of summary judgment against a defendant who contended that plaintiff's assurances that it would grant additional time to act under a contract amounted to a waiver of plaintiff's rights). Marine must be given an opportunity to prove its waiver defense. As Judge Winter stated in *Christian Dior*, "[t]his may be a close call, but that call should be made by a trier of fact at trial." 792 F.2d at 40.

\* \* \*

For the reasons stated above, the motion for summary judgment is denied.

SO ORDERED.